IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned On Brief July 31, 2007

## IN THE MATTER OF: M.A.B, D.C.M, M.A.M, M.I.M, D.Z.M and W.M.E.M.

**Direct Appeal from the Juvenile Court for Madison County**
**No. 43-38,921    Christy R. Little, Judge**

---

**No. W2007-00453-COA-R3-PT - Filed August 20, 2007**

---

The trial court terminated Mother's parental rights to six of her children based upon the persistence of conditions that led to removal of the children from Mother's care by the Department of Children's Services and upon finding that termination of Mother's parental rights was in the children's best interests.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; and Remanded**

DAVID R. FARMER, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Jeremy B. Epperson, Pinson, Tennessee, for the appellant.

Robert E. Cooper, Jr., Attorney General and Reporter, Lauren S. Lamberth Assistant Attorney General and Nancy S. Nelson, Assistant General Counsel, for the State of Tennessee, Department of Children's Services.

Angela L. Jenkins, Guardian ad Litem.

**OPINION**

This is a termination of parental rights case which culminated in the trial court's January 2007 order terminating Mother's parental rights to six of her minor children based on the persistence of conditions which led to the children's removal by the Department of Children's Services ("DCS") for the second time in 2005.   Mother is the unmarried mother of eight children; M.B. is the father

of all the children except one, DCM.[1]  In this appeal, Mother appeals the trial court's termination of her parental rights to DCM, born 7/9/95; MAM, born 9/8/97; MAB, born 7/20/99; MIM, born 8/3/00; DZM, born 6/20/02; and WMM, born 2/11/05.

Mother's elder children were first removed from her care in November 2001 due to truancy and neglect.  In December 2001, Mother stipulated that her children were dependent and neglected, and temporary custody of the children was placed with DCS.  DCS provided services including counseling and homemaker services; rent assistance; clothing and school supplies; daycare; and sexual abuse counseling for Mother's eldest child, who was abused by MB, is now residing with relatives, and is not a subject of the current lawsuit.  DCS again became involved with the family in 2004 based on a referral for lack of utilities and food in the home.  DCS found these allegations to be untrue.

DCS next became involved with the family in April 2005.  At that time, Mother had been incarcerated for violation of probation, and the children had been placed with relatives who were allegedly physically abusive.  Mother was released from jail during the investigation of the abuse charges.  Mother met with DCS for a Child and Family Team Meeting regarding a program designed to prevent removal, which included targeted case management, daycare, counseling, supervised visitation with MB, random drug screens, clinical assessment of Mother, and the provision of food for the family.  Following the meeting, however, Mother discovered that the utilities in her home, which she apparently shared with MB and her two brothers, had been cut off due to nonpayment of charges in the approximate amount of $600.  The rent also had not been paid, the house was unclean and infested with roaches, there was no food in the home, and the three men in the home tested positive for cocaine and marijuana.  Further, Mother had no money with which to buy food or obtain housing and utilities.  Therefore, on April 26, 2005, the trial court granted DCS's petition to remove the children from Mother's care and bring them into State custody.

In August 2006, DCS filed its petition for termination of Mother's parental rights based on abandonment for failure to establish a suitable home, substantial non-compliance with the permanency plan, and persistence of conditions that led to the removal of the children.  The trial court heard the matter in January 2007.  The trial court denied the petition based on abandonment and non-compliance with the permanency plan, but granted it on the ground of persistence of conditions.  Final judgment was entered in the matter on January 30, 2007, and Mother filed a timely notice of appeal to this Court.

### Issues Presented

Mother presents the following issues, as we slightly restate them, for our review:

---

[1] M.B.'s parental rights were terminated by the trial court on December 12, 2006.  That order has not been appealed. DCS's petition to terminate the parental rights of DCM's father was continued by the trial court, which entered final judgment with respect to Mother's parental rights pursuant to Tennessee Rules of Civil Procedure 54.02.

(1)     Whether the trial court erred in determining that clear and convincing evidence supported the termination of Mother's parental rights based on a persistence of conditions.

(2)     Whether the trial court erred by determining that the State had demonstrated by clear and convincing evidence that termination of Mother's parental rights was in the best interests of the children.

(3)     Whether DCS failed to provide reasonable efforts as required by Tennessee Code Annotated § 37-1-166, thereby negating Mother's alleged failure to remedy persistent conditions.

### *Standard of Review*

We review the decisions of a trial court sitting without a jury *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact, unless the evidence preponderates otherwise. *In Re: Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Tenn. R. App. P. 13(d). No presumption of correctness attaches, however, to a trial court's conclusions on issues of law. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000); Tenn. R. App. P. 13(d).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights. The Code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the bests interests of the child.

Tenn. Code Ann. § 36-1-113(c) (2005).

Thus, every termination case requires the court to determine whether the parent whose rights are at issue has chosen a course of action, or inaction, as the case may be, that constitutes one of the statutory grounds for termination. *In Re: Adoption of a male child, W.D.M.*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *3 (Tenn. Ct. App. Nov. 25, 2003)(*no perm. app. filed*); *see generally* Tenn. Code Ann. § 36-1-113(g)(1)-(9) (2005). The State may not deprive a parent of their fundamental right to the custody and control of their child unless clear and convincing evidence supports a finding that a statutory ground for termination exists and that termination is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c) (2005). Although the "clear and convincing evidence" standard is more exacting than the "preponderance of the evidence" standard, it does not require the certainty demanded by the "beyond a reasonable doubt" standard. *In Re: M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005). Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind

a firm conviction as to the truth. *Id.* Insofar as the trial court's determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent evidence of clear and convincing evidence to the contrary. *Id.* With this standard of review in mind, we turn to whether the trial court erred in terminating Mother's rights based on persistence of conditions.

*Analysis*

The trial court terminated Mother's parental rights upon determining that clear and convincing evidence supported a finding that the conditions leading to the children's removal from Mother persisted and were unlikely to be rectified in the near future, and that termination was in the best interests of the children. Tennessee Code Annotated Section 36-1-113(g)(3) identifies a ground for termination commonly known as "persistence of conditions." A parent's parental rights may be terminated where:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>> (i) The conditions which led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s) still persist;
>> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A)(2005 & Supp. 2006).

We begin our discussion of this case by agreeing with the trial court's comments that this is not the "typical" parental termination case that arises from intentional physical and/or mental abuse or willful abandonment. Further, there has been no suggestion in this case that Mother does not love her children. At the January hearing of this matter, Vanetta Mosely (Ms. Mosely), a family advocate with the Carl Perkins Center who supervised Mother's visitation and parenting with the children, testified that the children were raised to be well-mannered and loving, and that Mother "work[ed] well with them." Mother consistently has tested negative for illegal substance abuse, and Cynthia Perry (Ms. Perry), a DCS case manager, testified that Mother is "very good with the children." Rather, this is a case wherein Mother undisputedly has been unable to provide with any degree of consistency the rudimentary basics of housing, food and utilities; is unlikely to be able to do so in the foreseeable future; appears unwilling to purposefully pursue public housing offered to her by DCS; and has continued to live with, have children by, and expose her children to a man who Mother acknowledges sexually abused her eldest daughter.

-4-

We also note at the outset that mere poverty is neither ground nor arguable reason for the termination of a parent's rights. *In Re: DMD & JLA*, No. W2003-00987-COA-R3-PT, 2004 WL 1359046, at *5 (Tenn. Ct. App. June 17, 2004). In this case, however, Mother's unwillingness to pursue every outlet offered her by DCS to obtain continuous housing and utilities, in conjunction with her willingness to expose her children to her admittedly abusive boyfriend, and the persistence of these conditions for nearly two years following removal of the children from her care in April 2005, provide grounds for the termination of her parental rights under Tennessee Code Annotated § 36-1-113(g)(3)(A).

It is undisputed that, at the time this matter was heard, Mother had obtained housing through her mother by turning over to her mother a $1,000 lump sum disability payment. This housing consisted of a two bedroom home which DCS supervisor Gloria Daniels testified was in a dubious state of repair two months prior to the hearing. Further, it is undisputed that, as of the January hearing date, there were no utilities in the home. Although Mother testified that she had reached an agreement with the utility company to pay a portion of the outstanding balance and obtain utilities, Mother's ability to fulfill this commitment depended on her receipt of disability payments of an uncertain duration. Further, as the trial court noted, there was little indication that Mother would be able to purchase food and other necessities. Additionally, Mother testified that she refuses to live in housing provided by the Jackson Housing Authority, which would provide utilities, and Ms. Perry testified that DCS told Mother it would assist her with a deposit for a home, but Mother "never got back" to her and refused to seek housing through the Jackson Housing Authority. Additionally, Mother testified that she believes and always has believed that MB, the father of most of her children, sexually abused their daughter, yet Mother continued to live with MB and expose her children to him. The record in this case, read as a whole, clearly evidences that Mother has been unable to provide a safe, suitable home for her children and that she is unlikely to be able to do so in the near future. Clearly, in the nearly two years between removal of the children in April 2005 and the hearing of this matter in January 2007, Mother had been unable to secure a clean home and basic utilities. Further, although Mother is currently receiving disability payments, Mother testified that she will be paying her mother $350 in rent, which is more than half of the disability payment she anticipated receiving beginning February 2007. Although we are not insensitive to Mother's depression and sleep disorder, we agree with the trial court that Mother is simply unable to provide and care for these children. Additionally, the record unequivocally reflects that the children are happy and thriving with their foster parents, that adoption by the foster parents is anticipated, and that permanency in stable homes is in the children's best interests.

We next turn to Mother's assertion that DCS failed to make reasonable efforts to assist her to remedy her condition and return the children as required by Tennessee Code Annotated § 37-1-166. In the absence of limited circumstances not present in this case, DCS must make "reasonable efforts" to make it "possible for a child to safely return" to the child's home. Tenn. Code Ann. §§ 37-1-166(a)(2),-166(g)(2)(2005). Additionally, DCS may delay termination proceedings if it has not had sufficient opportunity to make reasonable efforts to provide services which would enable the child to return home safely. Tenn. Code Ann. § 36-1-113(h)(2)(C)(2005 & Supp. 2006). DCS has made "reasonable efforts" where, "in the exercise of reasonable care and diligence" it has

"provide[d] services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1)(2005).

Whether DCS has made reasonable efforts to provide services to enable a child to return safely to the home must be decided on a case-by-case basis in light of the circumstances of the case. *In the Matter of : C.M.C., C.L.C., and D.A.M.*, No. E2005-00328-COA-R3-PT, 2005 WL 1827855, at *9 (Tenn. Ct. App. Aug. 3, 2005) (*no perm. app. filed*). When determining whether DCS has made reasonable efforts, the court may consider factors such as: (1) the reasons for separating the parent from his or her child or children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the separation, (5) the resources available to the Department, (6) the duration of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial separation, the requirements in the permanency plan, and the Department's efforts. *Id.*; *In the Matter of: C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at * 7 (Tenn. Ct. App. Mar. 9, 2004)(*no perm. app. filed*). Certainly, parents must also make reasonable efforts to substantially comply with the requirements of the permanency plan and to rectify the conditions that led to the child's removal. *See id.*

In this case, Ms. Perry testified that the primary reason the children were removed from Mother's home in 2005 was that Mother did not have utilities. Ms. Perry further testified:

> We were - - DCS was going to assist her with her utilities. But on the date that we came to Court, [the trial court] stated that [Mother] was going to get her utilities on, that tax money was not going to pay for her to get them on, that she was going to get them on herself. At that point that's when [Mother] got a job at Maplewood.

Ms. Mosely testified that the Perkins Center did not assist Mother with obtaining utilities. Ms. Mosely stated:

> [Mother's] utilities were well beyond - - we only helped with a hundred dollars, and the agency can't afford to help with just that hundred dollars and end up losing it if she won't be able to pay the rest. She has to pay all of it up front and then we pay that last one hundred dollars at the end.

It is undisputed that Mother worked, at least for a time, at Maplewood, but no progress was made on the payment of her utility bill. Further, it is undisputed that Mother chose not to avail herself of public housing. It is difficult to imagine what additional steps DCS could have taken, other than to pay Mother's utility bill, to provide Mother and her children with suitable housing and utilities. Additionally, even assuming DCS were to pay the utility bill outright, it does not seem likely that Mother would be able to continue to provide housing, utilities, food and clothing to her children.

The trial court determined that grounds did not exist for termination of Mother's parental rights based on abandonment or failure to substantially comply with the parenting plan. Indeed, Mother completed some if not all of the requirements of the plan, except that she had been unable to procure suitable housing and to remove the children from the presence of MB other than when he was incarcerated. It is undisputed that the conditions which led to the removal of the children in April 2005 persisted at the time of hearing, where Mother had neither obtained suitable housing nor utilities. Additionally, in light of the entirety of the record, we agree with the trial court that Mother is unlikely to be able provide a safe, suitable home for these children in the near future, and that termination of Mother's parental rights is in the children's best interests.

### *Holding*

In light of the foregoing, the judgment of the trial court is affirmed. Costs of this appeal are taxed to the Appellant, Mother.

_____
DAVID R. FARMER, JUDGE