IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned On Briefs July 28, 2011

IN THE MATTER OF: JADA T.L.P. (d/o/b 10/11/2003) AND JOSEPH D.P.
(d/o/b 5/25/2009), Children Under Eighteen (18) Years of Age

Direct Appeal from the Juvenile Court for Sevier County
No. 10-000726 & 10-000727     Dwight E. Stokes, Judge

No. E2011-00291-COA-R3-PT-FILED-AUGUST 19, 2011

This is a termination of parental rights case. The juvenile court terminated the parental rights of the mother on the grounds of persistence of conditions, substantial noncompliance with the terms of her permanency plans, severe child abuse, and abandonment. The mother appeals, arguing the Department of Children's Services did not make reasonable efforts to reunite her with her children following their removal and did not clearly and convincingly prove termination of her parental rights was in the best interests of the children. We affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed
and Remanded

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J., and J. STEVEN STAFFORD, J., joined.

Robert L. Huddleston, Maryville, Tennessee, for the appellant.

Robert E. Cooper, Jr., Attorney General and Reporter, Alexander S. Rieger, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

MEMORANDUM OPINION[1]

---

[1]Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

Kimberly L.P. ("Mother") is the single mother of Joseph D.P. (d.o.b. 5/25/2009) and Jada T.L.P. (d.o.b. 10/11/2003).[2] Mother is an admitted drug addict who at the time of the hearing in this cause had recently begun a long-term drug rehabilitation program in Knoxville, Tennessee. Mother's abuse of prescription painkillers, primarily morphine tablets, began in 2006. Mother testified she initially used morphine on a recreational basis but later developed a "full blown addiction." In 2007, Mother's drug use led to an arrest and subsequent guilty plea to simple possession in Loudon County, Tennessee. By May 2008, Mother was ingesting morphine daily and hydrocodone twice per week, both without a doctor's prescription. Despite becoming pregnant in 2008, Mother's drug abuse continued. Her youngest child, Joseph, was consequently born addicted to drugs and in the lower tenth percentile for weight and length. He suffered from withdrawal, experienced uncontrollable fits, struggled to keep his milk down, and had to be weaned from opiate addiction through the extended administration of phenobarbital.

The Department of Children's Services ("DCS") intervened after learning of Joseph's condition and filed a petition for temporary custody of both children. DCS alleged Mother illegally obtained morphine pills from the maternal grandmother, ingested both morphine and hydrocodone during her pregnancy with Joseph, and caused Joseph to be born extremely drug exposed. DCS further alleged no less drastic alternative to removal would reasonably protect the children from an immediate threat to their health and safety pending a preliminary hearing because Mother's chronic drug addiction rendered her unfit to care for the children. The juvenile court, finding probable cause to believe the children were dependent and neglected and that removal was necessary, granted a temporary custody order and set a preliminary hearing for June 10, 2009. At the June 10 preliminary hearing, the juvenile court continued the matter and awarded Mother visitation contingent upon her passing drug screens. At the subsequent hearing, Mother stipulated to a finding of probable cause of dependency and neglect. Mother also stipulated at the final dependency and neglect hearing that she abused prescription drugs during her pregnancy with Joseph and caused the child to suffer from withdrawal. The juvenile court consequently concluded clear and convincing evidence supported a finding that both children were dependent and neglected "pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(F) and (G)."[3] It did not, however, find Mother

---

[2] This appeal concerns only the parental rights of Mother.

[3] Tennessee Code Annotated sections 37-1-102(b)(12)(F) and (G) provide that a "dependent and neglected child" includes a child:

(F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of such child or others;
(G) Who is suffering from abuse or neglect[.]

(continued...)

committed severe child abuse. Because Mother was incarcerated at the time of the final dependency and neglect hearing, the juvenile court ordered legal and physical custody of the children to remain with DCS.

DCS created at least two sets of permanency plans for Mother and the children. The first set of permanency plans required Mother to complete an alcohol and drug assessment, submit to random drug screens, attend parenting classes, obtain a legal income, and maintain appropriate housing for the children. The second set of permanency plans incorporated similar requirements and further required Mother to resolve her pending legal issues without incurring additional charges. DCS attempted to provide Mother with services to complete the requirements of her permanency plans, but those efforts were frustrated by Mother's refusal to cooperate and her incarceration. The record shows Mother did not attempt to comply with her permanency plans following the children's removal; rather, she continued abusing drugs and refused at least two drug screens. She was thereafter jailed from September 2009 to February 2010 and from March 2010 to July 2010 for violating the terms of her probation, restricting DCS's ability to provide services. Even when Mother was not incarcerated, DCS struggled to maintain contact with Mother.

DCS was able to provide Mother with some services despite the aforementioned difficulties. The record establishes the efforts of DCS as follows: (1) Mother's case manager, Lorrie Armstrong, made phone calls and sent letters of notice of the staffing of the permanency plans to Mother; (2) Ms. Armstrong met with Mother at court proceedings; (3) Ms. Armstrong spoke with Mother about rehabilitation programs and gave her telephone numbers to call for an alcohol and drug assessment; (5) Ms. Armstrong met with Mother in August 2009 to have Mother sign papers related to the children's education and health; (6) Ms. Armstrong asked Mother to take drug screens, which Mother refused; (7) DCS offered to conduct visitation if Mother passed the drug screens; (8) Laura Hamilton, a family service worker for DCS in Blount County, met with Mother at the Loudon County Jail while Ms. Armstrong was on maternity leave; (9) Ms. Hamilton discussed Mother's permanency plan and where she could obtain services following her release; (10) Ms. Armstrong administered two successful drug screens in July 2010; and (11) Ms. Armstrong provided visitation on five separate occasions following Mother's release from prison in July 2010. DCS also made substantial efforts to establish the paternity of two men Mother named as the putative fathers of Jada and Joseph and provided the children with a number of services designed to ensure their health and well-being.

DCS petitioned to terminate Mother's parental rights as to both children in May 2010

---

[3](...continued)
Tenn. Code Ann. §§ 37-1-102(b)(12)(F), (G) (2010).

while Mother was incarcerated in the Loudon County Jail. DCS alleged Mother had severely abused Joseph by ingesting drugs during pregnancy, had not maintained sobriety subsequent to removal of the children or following her release from prison in February 2010, had not obtained stable housing and income, and had not completed the requirements of her permanency plans. DCS further alleged Mother's conviction for a drug offense, conviction for violation of the Tennessee Financial Responsibility Law, and convictions for probation violation exhibited a wanton disregard for the children's welfare. Asserting termination of Mother's parental rights was in the best interests of the children, DCS sought a final decree forever severing the parent-child relationship between Mother and her two children.

The juvenile court conducted a final hearing on DCS's petition in October 2010 and took the matter under advisement. On January 12, 2011, the juvenile court issued a final judgment terminating the parental rights of Mother. The court found: (1) DCS made reasonable efforts to reunify Mother with her children based on the totality of the circumstances in the case; (2) DCS clearly and convincingly established the grounds for termination of substantial noncompliance, persistence of conditions, abandonment, and severe child abuse; and (3) DCS clearly and convincingly showed termination of Mother's parental rights was in the best interests of the children. On the issue of best interests, the court emphasized that maintaining the children's continuity of placement in a stable and loving pre-adoptive foster home, as well as their need to "move on," supported its decision. Mother timely appealed.

## II. Issues Presented

Mother presents the following issues, as we slightly restate them, for our review:

(1) Whether DCS made reasonable efforts to reunite Mother and her children; and

(2) Whether DCS proved by clear and convincing evidence that termination of Mother's parental rights was in the best interests of the children.

Mother does not argue DCS failed to prove grounds for the termination of her parental rights. These issues are therefore waived. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. App. R. 6(a), (b); *Bean v. Bean*, 40 S.W.3d 52, 55-56 (Tenn. Ct. App. 2000) (citations omitted).

## III. Standard of Review

This Court reviews a trial court's findings of fact *de novo* upon the record, according

a presumption of correctness to the findings unless a preponderance of the evidence is to the contrary. Tenn. R. App. P. 13(d)*; In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citation omitted). This Court will not reevaluate the determinations of a trial court based on an assessment of credibility unless clear and convincing evidence is to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005) (citation omitted). This Court reviews the record *de novo* where the trial court has not made a specific finding of fact. *In re Valentine*, 79 S.W.3d at 546 (citation omitted). No presumption of correctness attaches to a trial court's conclusions of law. Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citation omitted).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights. The Code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c)(1), (2) (2010). This two-step analysis requires appellate courts to consider "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Although the 'clear and convincing evidence' standard is more exacting than the 'preponderance of the evidence' standard, it does not require the certainty demanded by the 'beyond a reasonable doubt' standard." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007) (citation omitted). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *Id.* (citation omitted).

## IV. Analysis

### *A. Reasonable Efforts*

The first question before this Court is whether DCS made reasonable efforts to help reunite Mother with her children. The decision to pursue a termination of parental rights on the grounds of abandonment, persistence of conditions and/or substantial noncompliance generally invokes DCS's statutory duty to make reasonable efforts to facilitate the safe return of a child to the child's home. *In re R.L.F.*, 278 S.W.3d 305, 315 (Tenn. Ct. App. 2008)

(citing Tenn. Code Ann. § 37-1-166(b), -166(a)(2), -166(g)(2)); *see also In re Tiffany B.*, 228 S.W.3d 148, 151, 160 (Tenn. Ct. App. 2007) (vacating a finding of abandonment, substantial noncompliance, and persistence of conditions for failure to make reasonable efforts). Although DCS may be relieved of its duty to make reasonable efforts after a court of competent jurisdiction finds "aggravating circumstances," Tenn. Code Ann. § 37-1-166(g)(4)(A)-(C), it cannot withhold reasonable efforts "'in the hopes that a court will later make a finding . . . that retroactively 'forgives' DCS's lack of efforts. . . .'"[4] *In re Keisheal N.E.*, No. M2009-02527-COA-R3-PT, 2010 WL 2176104, at *13 (Tenn. Ct. App. May 28, 2010) (*no perm. app. filed*) (quoting *In re B.L.C* ., No. M2007-01011-COA-R3-PT, 2007 WL 4322068, at *9 (Tenn. Ct. App. Dec. 6, 2007)).

The statutory duty to make reasonable efforts includes an obligation to exercise "'reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family.'" *In re R.L.F.*, 278 S.W.3d at 316 (emphasis omitted) (citing Tenn. Code Ann. § 37-1-166(g)(1)). Courts evaluate the reasonableness of DCS's efforts in consideration of the following factors:

> (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Tiffany B.*, 228 S.W.3d at 158-59 (footnote omitted) (citing *In re Giorgianna H.*, 205

---

[4]DCS submits for the first time on appeal, and despite the filing of numerous affidavits of reasonable efforts, that it was not required to make reasonable efforts to reunite Mother with her children. DCS, however, was not relieved of its duty to make reasonable efforts on the grounds of Tennessee Code Annotated section 36-1-113(g)(1)–(3) prior to the termination hearing, because the court's order on dependency and neglect concluded only that the children were dependent and neglected "pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(F) and (G)." The court did not make a finding of aggravated circumstances which would relieve DCS of its statutory duty until the final judgment terminating Mother's parental rights. Because we find DCS made reasonable efforts, we need not consider whether the grounds in Tennessee Code Annotated section 36-1-113(g)(4)–(8), including the ground of severe child abuse, require the exercise of reasonable efforts in the absence of a prior finding of aggravated circumstances. *See In re Bernard T.*, 319 S.W.3d 586, 600 n.30 (Tenn. 2010); *In re Keisheal N.E.* ,No. M2009-02527-COA-R3-PT, 2010 WL 2176104, at *8 n.8 (Tenn. Ct. App. May 28, 2010); *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 n.26 (Tenn. Ct. App. Mar. 9, 2004).

S.W.3d. 508, 519 (Tenn. Ct. App. 2006)). Courts should decide the reasonableness of DCS's efforts "on a case-by-case basis in light of the unique facts of the case." *In re Bernard T.*, 319 S.W.3d 586, 601 (Tenn. 2010) (citing *In re J.C.D.*, 254 S.W.3d 432, 446 (Tenn. Ct. App. 2007)). The burden is on DCS to prove clearly and convincingly the reasonableness of its efforts. *In re R.L.F.*, 278 S.W.3d at 316 (citing *In re B.B.*, No. M2003-01234-COA-R3-PT, 2004 WL 1283983, at *9 (Tenn. Ct. App. June 9, 2004)).

The exercise of reasonable efforts is important because "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H.*, 205 S.W.3d at 518 (citations omitted). DCS employees must affirmatively and reasonably utilize their education and training to help a mother eliminate the conditions requiring removal of her children and to meet the responsibilities of her permanency plans before courts will terminate the parent-child relationship. *In re R.L.F.*, 278 S.W.3d at 316 (citations omitted). DCS's duty to affirmatively assist parents exists even if the parents do not seek assistance. *Id.* (citing *In re C.M.M.*, 2004 WL 438326, at *7). "While the Department's reunification efforts need not be 'herculean,' the Department must do more than simply provide the parents with a list of services and send them on their way." *In re Giorgianna H.*, 205 S.W.3d at 519 (citation omitted).

The legislature, however, did not place the burden to reunify parent and child on DCS's shoulders alone. *See State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008) (citation omitted). Reunification "is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents." *In re Tiffany B.*, 228 S.W.3d at 159 (citations omitted). "Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody." *Id.* Once services have been made available, parents must make reasonable efforts to rehabilitate themselves. *Id.* (citations omitted).

Mother argues the trial court erred when it considered the totality of the circumstances when deciding the issue of reasonable efforts. Mother contends her incarceration should not affect DCS's duty to make reasonable efforts or, in the alternative, it should place a higher burden on DCS to provide services. According to Mother, DCS did not make reasonable efforts either before or during her incarceration. We disagree. Having reviewed the record, we conclude DCS made reasonable efforts to assist Mother. DCS initially took affirmative steps to provide Mother with services which she refused to accept. Any further attempts to provide services were frustrated by Mother's persistent incarceration. Although we consider this a close case in light of the clear and convincing standard, it was ultimately Mother who did not make reasonable efforts to rehabilitate herself and it was ultimately Mother's actions that impeded DCS's ability to provide services. Considering the unique facts of this case, we affirm the juvenile court's finding on the issue of reasonable efforts.

## B. Best Interests

The second question before this Court is whether termination of Mother's parental rights was in the best interests of the children. Termination of a mother's parental rights is appropriate only if clear and convincing evidence establishes that eliminating those rights is in the best interests of the child or children named in the petition. Tenn. Code Ann. § 36-1-113(c)(2) (2010). Courts consider the following non-exhaustive list of factors when determining the best interests of a child:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(9) (2010). "Every factor need not be applicable in order for the trial court to determine that it is in the best interest of the child for a parent's right[s]

to be terminated." *In re D.C.A.*, No. M2008-01279-COA-R3-PT, 2009 WL 837877, at *8 (Tenn. Ct. App. Mar. 30, 2009) (*no perm. app. filed*). The weight and relevance of these factors may vary from case to case and it is possible that a single factor is determinative. *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). In evaluating the issue of best interests, the court must remember that any conflict between the best interests of a child and the adult parent "shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2010).

The juvenile court found termination of Mother's parental rights was in the best interests of the children based in part on their need for future stability in a loving home. The court explained the children were in a "drug-free, safe and nurturing environment in their foster home with an extended and loving family" where they appeared to be "thriving." In the court's view, the children needed an opportunity to "move on," whereas it would "take many more months or years before the mother is in a position to parent the children." The court found Mother had abused and neglected Joseph, failed to support the children, and thwarted her ability to reunify with the children. Considering the factors it deemed relevant, the juvenile court found clear and convincing evidence to show that termination was in the best interest of Joseph and Jada.

Mother argues the juvenile court's findings do not clearly and convincingly demonstrate termination was in the best interests of the children. Mother submits DCS did not provide evidence to show she failed to foster a meaningful relationship with the children, had not formed a bond with the children, or failed to visit the children when released from prison. Mother further argues she made an adjustment of circumstances by enrolling herself in long-term drug rehabilitation prior to the final termination hearing. DCS disagrees, submitting Mother did not make an adjustment of circumstances, conduct, or conditions as to make it safe for the children's return merely by enrolling in a rehabilitation program. Rather, an adjustment of circumstances would occur only if and when Mother completed the program many months later. DCS further argues Mother did not maintain regular visitation with the children, emphasizing the fact that she refused to take the drug tests necessary to permit visitation in the months immediately following removal. Mother's submission to drug tests only after the filing of the termination petition was too little, too late according to DCS. DCS instead maintained the fact that it took "a proceeding as grave as termination of parental rights to spur a mother to visit her children" weighed in favor of termination.

We affirm the decision of the juvenile court. The evidence shows Mother has not made such an adjustment of circumstances, conduct, or conditions as to make it safe and in the children's best interests to be in Mother's care. Mother did not maintain regular visitation or other contact with the children during these proceedings. And Mother inflicted abuse and neglect on Joseph. The foster parents, on the other hand, have developed a

healthy, loving relationship with the children and intend to adopt them at the conclusion of these proceedings. Considering the totality of the evidence before the juvenile court, we conclude it correctly found clear and convincing evidence to support termination of Mother's parental rights.

## V.  Conclusion

For the foregoing reasons, the decision of the juvenile court is affirmed. Costs of this appeal are assessed to the appellant, Kimberly L.P., for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE